## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTATE OF STEVEN SIDEWATER, By and through its Co-Executors, Peter Sidewater, Wendy Sidewater, and Judy Munroe<br>             and<br>SAMUEL I. SIDEWATER<br>             and<br>HERBERT T. VEDERMAN<br>                      Plaintiffs,<br><br>          v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A)<br>                      Defendant. | Civil Action No. |

## CIVIL ACTION COMPLAINT

Plaintiffs, the Estate of Steven Sidewater, by and through its Co-Executors, Peter Sidewater, Wendy Sidewater, and Judy Munroe (the "Estate"); Samuel I. Sidewater ("Sam Sidewater"), and Herbert T. Vederman ("Herb Vederman")(collectively "Plaintiffs"), by and through their undersigned counsel, bring the instant civil action against Defendant, John Hancock Life Insurance Co. (USA)("John Hancock" or the "Company")), and allege as follows:

### INTRODUCTION

1.      This case arises from John Hancock's improper attempts to enforce life insurance policy loans against policies originally issued to the Charming Shoppes in connection with the employment and earned benefits of longstanding executives (each of whom have continuing ties to the Philadelphia area) that had already been discharged in bankruptcy and John Hancock's resulting refusal to reinstate those  life insurance policies which it deemed, without cause, were

1

to be forfeited after decades of payments were made to John Hancock on behalf of Steven Sidewater, (deceased), Sam Sidewater and Herb Vederman.[1]

2.      Steven Sidewater, Sam Sidewater and Herb Vederman each had for years been directly employed directly employed or served as consultants to Charming Shoppes, Inc., trading as Fashion Bug, and continued in that capacity until Charming Shoppes was purchased by the Ascena Retail Group (Ascena"), a major apparel retailer that owned brands like Ann Taylor, LOFT, and Lane Bryant.

3.      In 2020, the parent company of Charming Shoppes and Ascena, the Retail Group, Inc. (the "Retail Group") including *inter alia* Ascena and Charming Shoppes listed as debtors, filed for Chapter 11 bankruptcy.

4.      For more than thirty years, the assignor of the split-life policies, Charming Shoppes, had dutifully complied with its contractual obligations to maintain and pay for substantial split-dollar life insurance policies based upon the lives of Steven Sidewater, Sam Sidewater and Herb Vederman with Defendant John Hancock. The relevant insurance policy assignments are attached collectively hereto as Exhibit "1".

5.      In 2012, the Ascena bought Charming Shoppes and each year, continued to be obligated to maintain the policies.

---

[1] While diversity in this matter as it relates to the Estate (which by operation of law is determined on the basis of where the Estate was established, *i.e.* Florida), the residency of the three co-trustees of the Estate is also completely diverse from the Defendant: Peter Sidewater lives in Maine; Wendy Sidewater lives in New York; and Judy Munroe resides in Florida and works in Pennsylvania.  They each have continuing business connections in the Philadelphia area, a fact that further supports venue in the United States District Court for the Eastern District of Pennsylvania.

6.      Each year from the inception of the issuance of the policies, Plaintiffs paid the income taxes assessed to them each individually on the premiums advanced by their employer, and later its successor, Ascena.

7.      Without the specific knowledge or approval of Steven Sidewater, Sam Sidewater or Herb Vederman, Charming Shoppes, and later Ascena, borrowed against the substantial principal of their split-dollar policies, causing the net death benefit on those split-dollar policies to be radically reduced (and/or become a loan burden) without any of those individuals ever being made aware of the encumbrance on the value of their earned assets in those policies.

8.      Pivotal to the claims made herein, the loans that had led to the dissipation of each policy's individual value became fully satisfied and discharged after the Retail Group filed a Chapter 11 bankruptcy. That action was based upon the identification of those loans as executory contracts and the failure of John Hancock as a creditor in the bankruptcy to file a proof of claim or otherwise protect its rights to collect on the loans after the bankruptcy was filed. The relevant insurance policy assignments are attached collectively hereto as Exhibit "1".

9.      As a result, when the insurance policies were assigned to Steven Sidewater, Sam Sidewater and Herb Vederman, they each stepped into Charming Shoppes (and in turn, Ascena's) shoes, in relation to their policies, *i.e.*, they each owned the policies, with the loans thereon fully discharged by the final order of the bankruptcy court eight months earlier.

10.     Accordingly, each of their chosen beneficiaries was entitled to receive the death benefit set forth in the respective policies .

11.     On September 4, 2023, Steven Sidewater died in Philadelphia, a city that he long called home and had established business interests in before moving to Florida in 2021, the state where his estate was established after his death.

12.    John Hancock did not pay the assigned death benefits to Steven Sidewater's estate after his death and has continued to seek payment of the exorbitant premiums and significant loans and interest from Sam Sidewater and Herb Veterman without good cause.

13.    Accordingly, each of the Plaintiffs bring the instant action to seek a declaration from this Court that they are entitled to payment on or coverage under their respective split-dollar life insurance policies upon payment of premiums at the same rate owed in 2020 before the Charming and Ascena bankruptcy – approximately $18,340 for Steven, $42,318 for Sam Sidewater and $15,300 for Herb Vederman – and with full entitlement to and payment on the death benefit provided for therein to the Estate of Steven Sidewater.

## THE PARTIES

14.    Plaintiff, the Estate of Steven Sidewater brings the Decedent's causes of action by and through the Estate's co-executors, Peter Sidewater (a resident of Maine), Wendy Sidewater (a resident of New York City) , and Judy Munroe (a resident of Florida and active business owner in Philadelphia Pennsylvania), each of whom being duly appointed and qualified to bring this case. The address of the Estate, as reflected in public filings, is and has been 3120 S. Ocean Blvd., Apt. 2301, Palm Beach, FL 33480.

15.    Plaintiff, Sam Sidewater, who has had, and continues to have currently, business interests in the Philadelphia area, is an adult individual with residences with his wife in Boca Raton, Florida and Ardmore, Pennsylvania.

16.    Plaintiff, Herbert T. Vederman, who also has had, and continues to have currently, business interests in the Philadelphia area, maintains a full-time residential address in Palm Beach, Florida.

4134568_1

17.     Defendant, John Hancock Life Insurance Co. (USA), was incorporated in Massachusetts on April 21, 1862, and today continues to operate its principal place in Boston Massachusetts with a principal place of business at 601 Congress Street, Boston, Massachusetts

18.     It is a wholly owned subsidiary of The Manufacturers Investment Corporation ("MIC"). MIC is a wholly owned subsidiary of John Hancock Financial Corporation ("JHFC"), which is an indirect, wholly owned subsidiary of The Manufacturers Life Insurance Company ("MLI"). MLI, in turn, is a wholly owned subsidiary of Manulife Financial Corporation ("MFC"), a Canadian-based, publicly traded financial services holding company.

19.     John Hancock provides financial services and life insurance through several locations in the Philadelphia area, including offices in Bala Cynwyd, Conshohocken, and Devon. These local offices, along with related independent agencies, offer the sale of life insurance products and the support for policies sold.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

21.     The Court has personal jurisdiction over Defendant because it has purposefully registered to do and continues to availed itself of the privilege of conducting business in the Commonwealth of Pennsylvania, including the marketing, selling, and administering insurance products to Pennsylvania residents and because Plaintiffs' claims directly arise out of or relate to Defendant's conduct in offering products associated with each of the Plaintiffs within the Commonwealth of Pennsylvania.

22.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including, but not limited to, the solicitation, issuance, and administration of the life insurance policies at issue.

23.     Venue is further proper in this District because (a) the insurance policies underlying Plaintiffs' claims were purchased in Pennsylvania by a Pennsylvania-based company, (b) the relevant transactions and occurrences took place in Pennsylvania, and (c) Defendant currently regularly conducts business within this District, including in the greater Philadelphia area.

## STATEMENT OF RELEVANT FACTS

### Plaintiffs' Family Business and the Life Insurance Policies Purchased for Plaintiffs' Benefit

24.     The Plaintiffs previously were substantial owners of Charming Shoppes, Inc., a specialty and plus sized clothing retail holding company, which was founded in 1940 by Moe Sidewater, Steven's and Sam's father and Herb's uncle.

25.     At its height, the Company had over 2,300 retail stores in the United States, with well-known subsidiaries offering clothing under the brand names, *inter alia*, of Lane Bryant and Fashion Bug.

26.     Steven Sidewater, Sam Sidewater and Herb Vederman were lifelong participants in this family business, holding executive positions and devoting much of their careers to its successes.

27.     As part of their compensation and retirement planning, Charming Shoppes purchased several split-dollar life insurance policies from John Hancock, for the benefit of Steven Sidewater, Sam Sidewater and Herb Vederman and their respective families.

28.     The policies included, *inter alia*:

    a.  Cert, #3,778,287-7 for the benefit of Steven (4/1/86)($2,750,000.00)
    b.  Cert. #3,778,281-0 for the benefit of Vederman (4/1/86)($2,750,000.00)
    c.  Cert. #3,778,288-5 for the benefit of Sam (4/1/86)($2,750,000.00)
    d.  Cert. #4,023,008-8 for the Benefit of Vederman (3/1/86)($1,100,000.00)
    e.  Cert. #4,023,010-4 for the Benefit of Sam (3/1/86) ($1,000,000.00)
    f.  Cert #4,023,003-9 for the Benefit of Steven (3/1/86)($1,000,000.00)

*See* true and correct copies of the insurance policies at issue, attached collectively hereto as Exhibit "2".

29.     Upon the departures of Steven Sidewater and Herb Vederman from employment by Charming Shoppes, they signed consulting agreements with Charming Shoppes in which that company agreed, *inter alia*, to maintain and pay the premiums on the split dollar policies attributable to them, with those premiums being charged as taxable income to Steven Sidewater and Herb Vederman, respectively.

30.     More specifically, Steven entered into a consulting agreement with Charming Shoppes dated May 15, 1989 (the "Steven Consulting Agreement"), attached hereto as Exhibit "3."

31.     Herb Vederman also entered into a consulting agreement dated February 1, 1991 (the "Vederman Consulting Agreement"), which is attached as Exhibit "4."

32.     The Steven Consulting Agreement provided in relevant part that Steven was then serving as Vice Chairman of the Board of Charming Shoppes and wished to terminate his active employment and to resign as director. [Steven Consulting Agreement, Exh. 3, p. 1]

33.     The Steven Consulting Agreement further provided that Steven would be retained as a consultant for the Company with a yearly salary of $175,000.

34.     Although the Steven Consulting Agreement had a "term" from May 15, 1989, through May 14, 1992, the employing company agreed it would "irrevocably" continue to pay

7

premiums on the Split-Dollar Policies attributable to Steven, such that the employing company would protect Steven's rights to the benefit of the maintenance of that policy and his beneficiaries would receive the proceeds of that policy at his death.

35.     Like the Steven Consulting Agreement, the Vederman Consulting Agreement provided, in relevant part, that Herb Vederman who was then serving as Executive Vice President of the employing company, wished to terminate his active employment therewith.

36.     The Vederman Consulting Agreement further provided that Vederman would be retained as a consultant for the Company at a yearly salary of $160,000.

37.     Also like the Steven Consulting Agreement (although the Vederman Consulting Agreement had a "term" from March 30, 1991, through March 31, 1992), Charming Shoppes agreed to "irrevocably" continue to pay premiums on the split-dollar life insurance policies attributable to Herb Vederman, such that Herb Vederman or his beneficiaries would continue  to receive the benefits of those policies.

38.     As set forth below and in conformity with this Agreement, Charming Shoppes and its successor continued to pay premiums on the split-dollar policies attributable to Herb Vederman, even after Charming Shoppes was acquired by Ascena in 2012.

39.     The parties continued to act as if they were performing under the agreements by providing 1099 tax income statements for their premiums, with each paying the income tax in reliance on the fact that Charming Shoppes/Ascena was paying their premiums for almost thirty years through 2020, thereby rendering the material terms of the consulting agreements as having survived through the time of the bankruptcy filing in 2020.

40.     Although Sam Sidewater, who was a Vice President and Board Member of Charming Shoppes, did not sign a formal Consulting Agreement, he became a consultant for the

8

Company in the same manner as Herb Vederman, and Charming Shoppes agreed to maintain the split-dollar policies attributable to Sam Sidewater and agreed to pay the premiums on his split-dollar policies in the same manner, as Steven Sidewater and Herb Vederman.

41.     Even after Charming Shoppes was acquire, Ascena continued to pay premiums on the split-dollar policies attributable to Steven Sidewater, Sam Sidewater and Herb Vederman, all of whom then received 1099's and paid the tax on the premiums attributed to them  as income.

42.     Until the bankruptcy, the premiums on the split-dollar policies attributable to each of the individuals were paid when due.

43.     When the premiums on the split-dollar policies were paid by Charming Shoppes, those premiums were treated as income to each individual, and thus, each year Charming Shoppes and Ascena would send a 1099 to each reflecting the income from the premiums paid on the split-dollar policies attributable to them.

44.     As of 2020, those 1099s reflected the premium payments made on Steven Sidewater's behalf as $18,340, on Sam Sidewater's behalf as $42,318 and on Herb Vederman's behalf as $15,300. *See* true and correct copies of Plaintiffs' 1099s from the year 2020, attached hereto as Exhibit "5."

45.     In turn, Charming Shoppes would be reimbursed for the payment of those policies by receiving deductions for tax purposes on the advancement of the payment of the premiums for the split-dollar policies attributable to each of the beneficiaries. Accordingly, each individual was effectively paying for their own premiums through the payment of taxes on the income Charming Shoppes was dispensing for each of the policies while the companies received a tax deduction for the premiums paid.

46.     Importantly, at some point, and unbeknownst to each individual Plaintiff, Charming Shoppes began to borrow against the principal of the split-dollar policies attributable to Plaintiffs such that, by 2020, the net death benefit on those split-dollar policies had been materially reduced and/or fully exhausted.

**Charming Shoppes Is Acquired by Ascena Who Subsequently Files Bankruptcy**

47.     In 2012, Charming Shoppes and its assets were acquired by Ascena, and Ascena continued to pay Plaintiffs' premiums in the same manner that Charming Shoppes had before.

48.     On July 23, 2020, Retail Group Inc. (f/k/a Ascena Retail Group, Inc.) and 63 affiliated debtors (collectively, the "Debtor") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond), then pending before the Honorable Frank. J. Santoro and jointly administered under Case No. 20-33113.

49.     On July 31, 2020, the Debtor filed its Chapter 11 Plan of Reorganization, which was subsequently amended five times on September 9, 2020, November 23, 2020, December 30, 2020, February 22, 2021, and February 24, 2021.

50.     Similarly, the Debtor filed a Plan Supplement on September 29, 2020, which was thereafter amended six times, with both the fifth and sixth amended supplements remaining in full force and effect.

51.     The relevant governing provisions are in the Debtors' Fifth Amended Plan Supplement, dated February 22, 2021. A copy of that Final Plan Supplement is attached hereto as Exhibit "6," with the most relevant pages found on 17 and 33.

52.    The Fifth Amended Supplement advised that all previous plans had been revoked and superseded by it, and contained, on its opening pages in "bold", a list of documents that included the following:

       a.   Exhibit C: Amended Assumed Executory Contract and Unexpired Lease List;

       b.   Exhibit C-1: Comparison to Assumed Executory Contract and Unexpired Lease List filed on February 17, 2021;

       c.   Exhibit D: Amended Rejected Executory Contract and Unexpired Lease List;

       d.   Exhibit D-1: Comparison to Rejected Executory Contracts and Unexpired Leases list filed on February 17, 2021.

*Id.*

53.    The Fifth Amended Supplement also reset the deadline for proofs of all claims to be filed relating to the rejection of any Executory Contracts, set a new, final deadline for 30 days from its filing date – March 24, 2021 – and provided that:

> Any Claims arising from the rejection of an Executory Contract that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the GUC Trust, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity. **Any such late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

*Id.* (emphasis supplied).

54.    The Fifth Amended Supplement then highlighted the split-dollar policies attributable to Plaintiffs as "rejected executory contracts" subject to its terms, and thus, subject to the 30-day deadline for the filing of all claims related to them. *Id.* at pp. 17, 33.

11

55.     Despite having claims related to the loans Charming Shoppes and Ascena took out in order to pay the premiums associated with Plaintiffs' split-dollar policies, however, John Hancock took no action whatsoever in the following thirty (30) days to protect its rights to collect on the policies' loans, such as by filing an appropriate Proof of Claim.

56.     Because no Proof of Claim related to the split-dollar policies was filed by the established February 22, 2021 deadline or the Order entered on March 24, 2021, deadline, the loans on those policies were rendered "fully satisfied, released, and discharged." See paragraph 53 above.

57.     In summary, John Hancock had waived its right to collect on any loans associated with the Plaintiffs' split-dollar policies,

**The Transfer of the Policies to Plaintiffs Free and Clear of the Loans, Resolution of the Unintended Tax Consequences of Those Transfers, and John Hancock's Inappropriate Attempts to Deprive Plaintiffs of Their Policies by Asserting Loans and Interest in Breach of the Policies and Prior Bankruptcy Orders**

58.     After the policy loans were satisfied and discharged in the bankruptcy, the covered individuals became interested in assuming their policies, so they could continue paying the pre-bankruptcy premiums and receive the full death benefits to which they and their beneficiaries were entitled thereunder.

59.     Plaintiffs' then-counsel effectuated each individual's request by assigning full ownership of their respective policies to each individually, resulting in millions of dollars in phantom income tax liability based on the policy loans and interest satisfied, rendering  the ownership of the split-dollar policies free and clear of all liability.

60.     Nevertheless, even though the tax liabilities on the policies had been resolved, John Hancock continued to assert that each then policy holder must not only pay the premiums on their policies, but also the loans and interest thereon.

12

61.    On March 16 and 17, 2023, John Hancock issued notices to each of the Plaintiffs (Steven Sidewater, Samuel Sidewater and Herbert Vederman) advising each that their policies would lapse unless exorbitant premiums and significant loan and interest payments (all no longer due) were made thereon by May 1, 2023:

    a.    <u>**Steven Sidewater**</u>

Dear Steven Sidewater:

**RE:    Policy No. 37 782 877 Insured(s): Samuel Sidewater**
**John Hancock Life Insurance Company (U.S.A.)**

A premium of $102,237.00 and accrued loan interest of $636,307.44 is due on April 01, 2023.

Payment of the total billed amount will keep your policy in good standing. Please be advised that should you elect not to pay all of the accrued loan interest, a minimum of $755,171.60 in addition to the full premium amount, will be required to ensure that your policy's status remains intact to the next policy anniversary.

The guaranteed cash value supports your outstanding loan balance. Therefore, accruing loan interest, together with the outstanding loan amount will exceed the available cash value, and could possibly cause your policy to lapse prior to the next scheduled billing date.

To keep your policy from lapsing, please submit a payment of $857,408.60 in the enclosed return envelope.

**If no action is taken, your policy will lapse on May 01, 2023.**

.    .    .    .    .

Thank you for selecting John Hancock for your financial needs.

(Empasis supplied in the original)

    b.    <u>Samuel Sidewater</u>

**RE: Policy No. 37 782 885   Insured(s) Samual Sidewater**
**John Hancock Life Insurance Company (U.S.A)**

A premium of $116,180.00 and accrued loan interest of $844,903.62 is due on April 01, 2023.

Payment of the total billed amount will keep your policy in good standing. Please be advised that should you elect not to pay all of the accrued loan interest, a minimum of $957,543.57 in addition to the full premium amount,

will be required to ensure that your policy's status remains intact to the next policy anniversary.

The guaranteed cash value supports your outstanding loan balance. Therefore, accruing loan interest, together with the outstanding loan amount will exceed the available cash value, and could possibly cause your policy to lapse prior to the next scheduled billing date.

Please submit a payment of $1,073,723.57 to keep your policy from lapsing in the enclosed return envelope.

**If no action is taken, your policy will lapse on May 01, 2023.**

.    .    .    .    .

Thank you for selecting John Hancock for your financial needs.

(Emphasis in the original)

      c.     Herbert Vederman

Dear Herbert Veerman :

    **RE: Policy No. 37 782 810 Insured(s): Herbert Vederman**

    **John Hancock Life Insurance Company (U.S.A.)**

A premium of $98,167.50 and accrued loan interest of $616,997.82 is due on April 01, 2023.

Payment of the total billed amount will keep your policy in good standing. Please be advised that should you elect not to pay all of the accrued loan interest, a minimum of $647,994.08 in addition to the full premium amount, will be required to ensure that your policy's status remains intact to the next policy anniversary.

The guaranteed cash value supports your outstanding loan balance. Therefore, accruing loan interest, together with the outstanding loan amount will exceed the available cash value, and could possibly cause your policy to lapse prior to the next scheduled billing date.

Please submit a payment of $746,161.58 to keep your policy from lapsing in the enclosed return envelope.

**If no action is taken, your policy will lapse on May 01, 2023.**

.    .    .    .    .

Thank you for selecting John Hancock for your financial needs.

(Emphasis in the original)

True and correct copies of John Hancock's March 2023 Notices are collectively attached hereto as Exhibit "7".

14

4134568_1

62.     Based on the loan and interest burdens, demonstrating further improper action on policy payment, John Hancock initially also refused to pay any death benefit of Policy # 3,778,287-7 (for the benefit of Steven's estate in the amount of $2,750,000.00) upon Steven's death in September 2023.

63.     John Hancock did pay to Steven's Estate on another separate policy (Policy Number 4023003-9), but even then, initially paid only $823,914.36 on a $1 million policy.

64.     That initial failure to provide full payment was once again based on improper loans John Hancock had no right to continue to collect on and the $200,000 shortfall was subsequently paid upon further negotiation and demand.

65.     Simply stated, John Hancock has no right to collect on claims deemed satisfied and discharged in the bankruptcy because once each individual assumed the right to their split-dollar policies, each owned their respective policies free and clear of all loans and claims, with the full death benefits payable to the insured's named beneficiaries when they died.

66.     Plaintiffs seek through the instant action a declaration from this Court that their respective insurance policies be fully paid and reinstated at the premiums owed in 2020 and that the death benefits of the policies are unburdened by any policy loans, which were discharged in the Ascena bankruptcy, along with attorney fees, costs, and any other relief the Court deems equitable and just.

67.     Without such a declaration and further payment to the Estate, each individual Plaintiff would be deprived of the life insurance coverage rightfully earned and relied on for decades. Further, at this time neither two surviving Plaintiffs could replace the policies on comparable terms given their older age.

## COUNT I
## DECLARATORY JUDGMENT

68.    Plaintiffs incorporate the paragraphs above as though set forth in full herein.

69.    Plaintiffs have stated an actual controversy, which is definite, concrete, and ripe for adjudication by this Court, in that, John Hancock has asserted it has the ability to collect on the policy loans it alleges burdens Plaintiffs' split-dollar life insurance policies, and Plaintiffs assert that those loans were satisfied and discharged in the Ascena bankruptcy by virtue of John Hancock's waiver by failing to file a proof of claim related thereto.

70.    Accordingly, pursuant to 42 Pa.C.S. § 7531, *et seq.*, Plaintiffs respectfully seek a declaration that their identified split-dollar policies are reinstated by John Hancock based on the premiums paid by Steven ($18,340), Sam ($42,318) and Vederman ($15,300) in 2020, before the Ascena bankruptcy, and that Plaintiffs' death benefits will be paid in full, unburdened by the former policy loans that were satisfied and discharged.

71.    This requested declaration would conclusively resolve and terminate the controversies alleged above and remove the uncertainty created by the instant dispute.

## COUNT II
## BREACH OF CONTRACT THROUGH THE
## IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

72.    Plaintiffs incorporate the paragraphs above as though set forth in full herein.

73.    Each of the following split-dollar life insurance policies are valid insurance contracts purchased by Charming Shoppes on Plaintiffs' behalf and paid for by Charming Shoppes and Ascena for over three decades, satisfying Plaintiffs' obligations thereunder:

- e.    Cert. #3,778,828-7 for the benefit of Steven (4/1/86) – (initial face amount of $2,750,000.00)
- f.    Cert. #3,778,828-1 for the benefit of Vederman (4/1/86) – (initial face amount of $2,750,000.00)

16

     g.  Cert. #3,778,828-8 for the benefit of Sam (4/1/86) – (initial face amount of $2,750,000.00)
     h.  Cert. #4023008 for the Benefit of Vederman (3/1/86) – (initial face amount of $1,000,000.00)
     i.  Cert. #4023010 for the Benefit of Sam (3/1/86) – (initial face amount of $100,000.00)
     j.  Cert #4023003 for the Benefit of Steven (3/1/86) – (initial face amount of $1,000,000.00).

74.    As an expressed or implied term of the split-dollar policies, John Hancock was required to exercise the utmost good faith and fair dealing in the handling of Plaintiffs' life insurance coverage.

75.    Unfortunately, John Hancock has not exercised good faith in its dealings with any of the Plaintiffs and instead continued to try to enforce certain policy loans as conditions for Plaintiffs' continued insurance coverage despite its knowledge that those loans had already been deemed satisfied and discharged in the Ascena bankruptcy.

76.    Even worse, John Hancock has refused, and continues to refuse, to provide the full death benefit contemplated in those policies to Plaintiffs' beneficiaries in the event of Plaintiffs' deaths, until the policy loans and interest thereon are paid in full, in breach of their obligations under the policies.

77.    John Hancock has no reasonable basis to use any alleged outstanding balance on the policy loans as reason to deny Plaintiffs coverage, and thus, its conduct constitutes a gross disregard of Plaintiffs' interests and is part of a broader pattern of behavior showing a conscious and/or knowing indifference to their interests.

78.    Accordingly, the foregoing conduct by John Hancock constitutes a breach of the policies' implied covenants of good faith and fair dealing, which breach has caused Plaintiffs to lose the insurance coverage they in place for over three decades, incur unnecessary expenses

4134568_1

including substantial counsel fees, suffer unnecessary delay and hardship, and other damages to be resolved at trial.

## COUNT III
## STATUTORY BAD FAITH, 42 Pa.C.S. § 8371

79.    Plaintiffs incorporate the paragraphs above as though set forth in full herein.

80    Under 42 Pa.C.S. § 8371,

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith towards the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371

81.    John Hancock has acted in bad faith towards Plaintiffs by denying the continuation of their life insurance coverage absent payment of loans and interest on which John Hancock no longer had any right to collect after it waived its right to do so in the Ascena bankruptcy.

82    John Hancock had no reasonable basis for denying Plaintiffs coverage absent such payments, because it knew or should have known that the Fifth Amended Plan Supplement in the Ascena Bankruptcy had barred John Hancock from pursuing those claims after it failed to file a Proof of Claim, thereby rendering them satisfied and discharged.

83.    Accordingly, as a result of John Hancock's outrageous actions and breach of the policies, Plaintiffs now seek damages for the losses they have suffered and will suffer, seek the

restoration of the insurance coverage to which they are entitled, and seek punitive damages and attorney's fees in accordance with the Pennsylvania Bad Faith Insurance statute.

**COUNT III**
**VIOLATION OF PENNSYLVANIA'S**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

84.     Plaintiffs incorporate the paragraphs above as though set forth in full herein.

85.     At all times relevant hereto, John Hancock engaged in fraudulent and/or deceptive conduct which created a likelihood of confusion or of misunderstanding on the part of Plaintiffs. 73 Pa.C.S. § 201-2(xxi).

86.     Specifically, John Hancock misrepresented its ability to collect on the policy loans associated with Plaintiffs' split-dollar policies, as well as the fact that Plaintiffs were required to pay the loans and interest thereon in full in order to maintain appropriate life insurance coverage.

87.     In doing so, they confused the Plaintiffs into believing that they could no longer afford the life insurance coverage they had spent several years maintaining, despite the fact that the charges being placed on them were improper, and absent those improper charges they would have been able to make appropriate payments.

88.     As a direct and proximate result of the violations of the UTPCPL by John Hancock, the Plaintiff has sustained damages to be proven at trial, including the attorney fees and costs associated with the instant action, and the loss of their life insurance policies maintained throughout much of their life, which cannot be readily replaced.

**WHEREFORE,** Plaintiffs, Estate of Steven Sidewater, Samuel I. Sidewater and Herbert T. Vederman, each hereby demand judgment against Defendant, John Hancock Life Insurance Co., as follows:

19

     a.     A declaratory judgment that the Plaintiffs' identified split-dollar policies are reinstated based on the premiums paid by Steven Sidewater ($18,340), Sam Sidewater ($42,318) and Herb Vederman ($15,300) in 2020, before the Ascena bankruptcy, and that Plaintiffs' death benefits will be paid in full, unburdened by the former policy loans that were satisfied and discharged;

     b.     The issuance of two new death benefits documents for Sam Sidewater and Herb Vederman, matching the original death benefits set forth in paragraph 22 above and the premiums that Sam Sidewater and Herb Vederman had been paying prior to the Ascena Bankruptcy in 2020;

     c.     Damages to Steven Sidewater's Estate in an amount to be proven at trial, which to date are more than $2,750,000, exceeding the amount requiring referral of this case to arbitration;

     d.     The award of attorneys' fees and costs;

     e.     Interest Thereon calculated at the proper applicable statutory rate;

     f.     All other statutory damages; and

     g.     Any such other relief as this Court may deem equitable and just.

---

**<u>NOTICE OF PRESERVATION OF EVIDENCE</u>**

     **PLAINTIFFS HEREBY DEMAND AND REQUEST THAT DEFENDANT TAKE ALL NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, AND DISCOVERABLE MATERIALS, WHETHER ELECTRONIC OR OTHERWISE, WHICH MAY IN ANY MANNER BE RELEVANT OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.**

---

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By:    */s/ Barry W. Krengel*
        Paul R. Rosen, Esquire (PA Bar No. 13396)
        Barry W. Krengel, Esquire (PA Bar No. 28517)
        Adam A. Filbert, Esquire (PA Bar No. 330960)

        One Logan Square
        130 N. 18th Street, Suite 1800
        Philadelphia, PA 19103
        215.241.8888
        prosen@sgrvlaw.com
        bkrengel@sgrvlaw.com
        afilbert@sgrvlaw.com
        *Counsel for Plaintiffs*

Dated: 03.05.2026