**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ESTATE OF STEVEN SIDEWATER,** ***by and through its co-executors, Peter Sidewater, Wendy Sidewater, and Judy Munroe,*** **SAMUEL I. SIDEWATER, HERBERT T. VEDERMAN** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 26-1420** |
| **JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)** | : | |

**MURPHY, J.** **November 9, 2026**

# MEMORANDUM

Life insurance is intended to provide financial security. Borrowing against the insurance's cash value, as so many do, jeopardizes this protection. Here, three employees of a family-owned business unfortunately discovered that risk. Since 1986, each employee had enjoyed life insurance coverage under split-dollar plans shared by their employer. Unbeknownst to the employees, their employer was borrowing heavily against the policies. When their employer went bankrupt in 2020, the employees sought ownership of the policies, believing that they could take them debt-free. Three years later, when one employee passed away, the insurer withheld millions of dollars in expected death benefits for failure to pay back the outstanding loans. The decedent's estate, and both surviving employees, now petition this court for redress against the insurer. The law, however, does not require the insurer to forgive loans taken by the policy owners. We therefore grant the insurer's motion to dismiss in full.

## I. FACTUAL BACKGROUND

This case arises from a dispute over six life insurance policies issued by defendant John Hancock Life Insurance Company (U.S.A.) ("John Hancock") for the benefit of Steven

Sidewater (deceased, whose estate is now a plaintiff in this action), Samuel Sidewater, and Herbert Vederman. DI 19 ¶¶ 24-28. Plaintiffs were longtime executives of Charming Shoppes, Inc. ("Charming Shoppes"), a family-owned retail company founded by Steven and Samuel Sidewater's father and Herbert Vederman's uncle. *Id.* ¶¶ 24-26. As part of plaintiffs' compensation and retirement planning, Charming Shoppes purchased six split-dollar life insurance policies from John Hancock in 1986, two for each employee (the "Policies").[1] *Id.* ¶¶ 27-28.

**a. The Policies**

After Steven Sidewater and Herbert Vederman left their executive positions, each entered into a consulting agreement with Charming Shoppes, dated May 15, 1989, and February 1, 1991, respectively. *Id.* ¶¶ 29-31. Under those agreements, Charming Shoppes agreed to "irrevocably" continue paying the premiums on the Policies so that plaintiffs and their beneficiaries would continue to receive the Policies' benefits. *Id.* ¶¶ 32-38. Charming Shoppes similarly agreed to maintain Samuel Sidewater's policies and pay their premiums. *Id.* ¶ 40.

In 2012, Ascena Retail Group, Inc. (Ascena) acquired Charming Shoppes and continued paying the premiums on the Policies. *Id.* ¶¶ 41-42, 47. Throughout this period, Charming Shoppes and Ascena reported the premium payments as taxable income to plaintiffs, who paid

[1] Plaintiffs identify the six life insurance policies as: (1) Policy No. 3,778,287-7, insuring Steven Sidewater, dated April 1, 1986, with a face amount of $2,750,000; (2) Policy No. 3,778,281-0, insuring Herbert Vederman, dated April 1, 1986, with a face amount of $2,750,000; (3) Policy No. 3,778,288-5, insuring Samuel Sidewater, dated April 1, 1986, with a face amount of $2,750,000; (4) Policy No. 4,023,008-8, insuring Herbert Vederman, dated March 1, 1986, with a face amount of $1,100,000; (5) Policy No. 4,023,010-4, insuring Samuel Sidewater, dated March 1, 1986, with a face amount of $1,000,000; and (6) Policy No. 4,023,003-9, insuring Steven Sidewater, dated March 1, 1986, with a face amount of $1,000,000. DI 19 ¶ 28; DI 19-3.

the corresponding income taxes. *Id.* ¶¶ 39, 43-45. As of 2020, the taxable income attributable to the life insurance protection for each plaintiff was: $18,340 for Steven Sidewater, $42,318 for Samuel Sidewater, and $15,300 for Herbert Vederman. *Id.* ¶ 44; DI 19-6 at 2-4.[2]

The Policies each contained provisions permitting their owners to borrow against their cash values, specifically providing that: "[t]he certificate is the only security for the loan," "[a]ny amount payable by us is reduced by the certificate debt," and "if the certificate debt equals or exceeds the loan value, the certificate will then terminate." *See* DI 19-3 at 4-5, 26-27, 44, 78-79, 97-98, 122-23.[3]

The Policies also permit the owner to exercise the rights and privileges granted by the certificate without the beneficiary's consent. *See* DI 19-3 at 7. Accordingly, at some point, Charming Shoppes or Ascena began borrowing against the cash value of the Policies, without plaintiffs' knowledge or approval. DI 19 ¶¶ 7, 46. Plaintiffs allege that these loans substantially reduced, and in some instances exhausted, the net death benefits available under the Policies. *Id.* ¶ 46.

**b. The Bankruptcy**

On July 23, 2020, Ascena (subsequently renamed Retail Group, Inc.) and sixty-three affiliated debtors filed voluntary petitions for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia (the "Ascena Bankruptcy"). *Id.* ¶ 48. The

---

[2] Unless otherwise indicated, we adopt the sequential pagination supplied by the CM/ECF docketing system.

[3] The FAC's exhibit for Samuel Sidewater's policy, No. 3,778,288-5 (Face value $2,750,000 dated April 1, 1986) appears to be missing additional pages to support this language. *See* DI 44. Because the parties do not contest that the contractual language is consistent across the Policies, we assume it is. *See* DI 23-1 at 8.

debtors subsequently filed a plan of reorganization and several amended plan supplements, including the fifth amended plan supplement dated February 22, 2021 (collectively, the "Plan"), which identified the Policies as among the executory contracts listed for rejection. DI 19 ¶¶ 49-54; DI 19-7 at 34.

The supplement also incorporated a provision requiring any proofs of claim arising from the rejection of executory contracts to be filed within thirty days. DI 19-7 at 9. Under that provision, untimely claims arising from the rejection of executory contracts would be disallowed, barred from assertion, and deemed satisfied, released, and discharged. *Id.*[4] John Hancock did not file any proofs of claim concerning the Loans or otherwise take action to preserve its asserted

[4] The exact language of the supplement states:
"Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory contract that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the GUC Trust, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity. Any such late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Any Claims arising from the rejection of an Unexpired Lease shall not be automatically Disallowed, but shall be subject to the Claims resolution process. To the extent an Entity holds both a late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease and a liquidated, non-contingent Claim listed in the Schedules or a Proof of Claim, only such late-filed Claim shall be deemed fully satisfied, released, and discharged pursuant to this paragraph. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.
DI 19-7 at 9-10.

rights to repayment within the required time. DI 19 ¶¶ 55-57. Plaintiffs contend that, consequently, the Loans were satisfied and discharged through the bankruptcy proceedings. DI 19 ¶¶ 53-57.

**c. The Policies' Transfer and Lapse**

After the Ascena Bankruptcy, plaintiffs' then-counsel effectuated each employee's request to assume full sole ownership of their respective policies. DI 19 ¶ 59. Plaintiffs allege that these assignments resulted in millions of dollars of taxable income, associated with the purported satisfaction of the outstanding policy loans and accrued interest. DI 19 ¶¶ 59-60. Plaintiffs maintain that they acquired ownership of the Policies free of the outstanding loan obligations. DI 19 ¶¶ 59-60, 65. John Hancock, however, continued to treat the Loans and accrued interest as outstanding obligations under the Policies. DI 19 ¶ 60.

On March 16 and 17, 2023, John Hancock issued notices to plaintiffs advising that the Policies would lapse on May 1, 2023, unless substantial payments were made toward premiums and the outstanding Loans. DI 19 ¶ 61; DI 19-8. The notices demanded payments totaling $857,408.60 from Steven Sidewater, $1,073,723.57 from Samuel Sidewater, and $746,161.58 from Herbert Vederman to prevent the Policies from lapsing. *Id.* These amounts included premiums and sums attributable to outstanding policy loans and accrued interest. *Id.* Plaintiffs allege that John Hancock improperly continued to impose these obligations, notwithstanding the prior bankruptcy proceedings, and prevented plaintiffs from maintaining the Policies at the premium levels in effect before the Ascena Bankruptcy. DI 19 ¶¶ 60-61, 75-78.

On September 4, 2023, Steven Sidewater died in Philadelphia, Pennsylvania. DI 19 ¶ 11. John Hancock refused to pay any death benefit under his $2.75 million policy, and paid only

$823,914.36 of his $1 million policy, as reductions against the outstanding policy loans. DI 19 ¶¶ 62-65.

## II. PROCEDURAL BACKGROUND

Plaintiffs brought this action seeking to reinstate the Policies, with premium levels at amounts owed in 2020, before the Ascena Bankruptcy, and with payout of full death benefits to the appropriate beneficiaries. DI 19 ¶¶ 66, 69-71. The operative first amended complaint (FAC), filed June 8, 2026, requests three forms of relief: (1) a declaration reinstating the Policies accordingly; (2) damages associated with John Hancock's breach of contract through the implied duty of good faith and fair dealing; and (3) damages associated with John Hancock's violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL). DI 19 ¶¶ 68-83.

John Hancock now moves to dismiss all three claims under Federal Rule of Civil Procedure 12(b)(6). DI 23. The parties filed their opposition and reply briefs (DI 24; DI 27), and the Court heard oral argument on October 8, 2026. DI 36. John Hancock principally contends that relief is inappropriate because the outstanding loan payments do not constitute dischargeable debt under bankruptcy law and therefore survived the bankruptcy proceedings. DI 23-1 at 6-16. Plaintiffs maintain that John Hancock's failure to preserve its interests through the bankruptcy claims process extinguished its right to enforce the Loans. DI 24 at 12-20.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the plaintiff alleges facts allowing the

court to reasonably infer that the defendant is liable for the alleged misconduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere legal conclusions or threadbare recitals of the elements of a cause of action will not suffice. *Id.* at 555.

## IV. DISCUSSION

### a. Count I Declaratory Judgment

Plaintiffs first seek a declaration reinstating the Policies based on premiums in amounts indicated on their respective Forms 1099-R in 2020, before the Ascena Bankruptcy, and confirming that plaintiffs' death benefits will be paid in full, unburdened by the Loans they allege were satisfied and discharged. DI 19 at 16. John Hancock contests the underlying legal premise, arguing that although the Policies were rejected under the Plan, the rights to loan repayment cannot be considered claims "arising from the rejection of" the Policies and therefore were not waived from inaction during the Ascena Bankruptcy. DI 23-1 at 5-16.

A bankruptcy plan may provide for the "assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor." 11 U.S.C. § 1123(b)(2). A rejection of an executory contract constitutes a breach of that contract. 11 U.S.C. § 365(g). A claim arising from a rejection of an executory contract under chapter 11 is generally treated as though it arose before the bankruptcy petition was filed. 11 U.S.C. § 502(g)(1). All rights that would ordinarily survive a contract breach remain in place after a rejection in bankruptcy. *See Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 372 (2019). The plan here defines a "Claim" as a "right to payment," or corresponding equitable relief. *See* DI 19-7 at 2 n.2; 11 U.S.C. § 101(5); *In re Retail Grp., Inc.*, No. 20-33113, DI 1794 at 3 (Bankr. E.D. Va. Feb. 24,

2021) (Amended Joint Chapter 11 Plan, art. I.A.30) (internal pagination).[5] Under the Plan, John Hancock had 30 days to file any proof of claim ("right to payment") arising from the rejection of the Policies. *See* DI 19-7 at 9.

We agree with John Hancock that the repayment of the Loans does not meet this definition. The Loans created no independent right to repayment that could be discharged in the Ascena Bankruptcy's rejection of the Policies. Rather, the Loans constituted advances against the Policies' cash values, enforceable through reductions in the benefits payable under the Policies. *See* DI 19 ¶¶ 7, 46. The right to payment on the Loans did not arise out of the rejection of the Policies under the Plan.

Plaintiffs respond that, notwithstanding the contractual vehicle by which the Loans were created, the Loans nevertheless created an "interest" in the Policies for John Hancock, and all interests in executory contracts were extinguished when the Plan was confirmed, pursuant to 11 U.S.C. § 1141(c).[6] DI 24 at 3, 15-17. However, this provision serves to extinguish a *creditor's* security interest in property addressed by a confirmed plan, and John Hancock's rights under the policy loans are distinguishable from the liens held by traditional creditors. Loans taken against the cash value of a life insurance policy do not create an ordinary debtor-creditor

[5] The Plan's definition follows 11 U.S.C. § 101(5), which in full states: The term "claim" means-- (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

[6] 11 U.S.C. § 1141(c) states that property "dealt with by" a bankruptcy plan is "free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."

relationship, but instead constitute advances against the insurer's existing contractual obligations, reducing the benefits ultimately payable under the policy. *See United States v. Sullivan*, 333 F.2d 100, 112-13 (3d Cir. 1964); *Plastipak Packaging, Inc. v. DePasquale*, 75 F. App'x 86, 93-94 (3d Cir. 2003); *see also* 2 *Collier on Bankruptcy* ¶ 101.12 (16th ed. 2026) ("The loan, therefore, is not a claim (right to payment) that the insurance company can assert against the estate; nor will the debtor's obligation be a debt that will be discharged under section 523 or 524."). Instead, the contractual right to loan payments are substantive rights arising from the Policies themselves, not their rejection, and therefore survive the bankruptcy. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119 n.8 (3d Cir. 2001) ("[R]ejection does not affect the parties' substantive rights under the contract.").

Plaintiffs have therefore failed to plead facts adequate to support the declaration they seek. Because the Loans did not arise from the rejection of the Policies, nor did they create a debtor-creditor relationship between John Hancock and the policy owners, John Hancock possessed no claim, nor interest, for repayment of the Loans that could have been discharged through the bankruptcy proceedings. *See Sullivan*, 333 F.2d at 112-13; *Plastipak*, 75 F. App'x at 93-94. The rejection of the Policies did not extinguish John Hancock's preexisting contractual right to reduce the benefits payable under the Policies by the amounts previously advanced. John Hancock was, in turn, under no obligation to file a Proof of Claim with respect to the Loans within that 30-day window. Viewing the facts in the most favorable light to plaintiffs establishes that the Policies expressly permitted John Hancock to reduce benefits by outstanding certificate debt and to terminate coverage when that debt reached the applicable

loan value. Therefore, Count I's requested declaration is untenable.

**b. Count II Breach of Contract Through the Implied Duty of Good Faith and Fair Dealing**

Pennsylvania law does not recognize a claim for a breach of the implied covenant of good faith and fair dealing, but only a breach of contract through the implied duty of good faith and fair dealing. *Sheinman Provisions, Inc. v. National Deli, LLC*, No. 08-453, 2008 WL 2758029, at *3 (E.D. Pa. July 15, 2008); *LSI Title Agency, Inc. v. Evaluation Services, Inc.*, 951 A.2d 384, 391 (Pa. Super. Ct. 2008). Such a claim must allege: (1) a contract exists or existed; (2) the defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract other than the covenant; and (3) resultant damages were incurred by the plaintiff. *Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 584 (E.D. Pa. 2009). Here, plaintiffs plead the existence of valid insurance contracts (the Policies) and resultant damages (the loss of insurance coverage). DI 19 ¶¶ 73, 78. The question is whether plaintiffs have pleaded facts demonstrating that John Hancock breached a specific duty imposed by the Policies.

Plaintiffs first allege in the FAC that John Hancock's breach was its attempt to "enforce loans it knew had been deemed satisfied." DI 24 at 21-22; DI 19 ¶ 75. Having already concluded that the Loans were not extinguished by the Ascena Bankruptcy, this argument holds no water. However, during oral argument, plaintiffs suggested two other breaches that would not rely on the waiver argument. First, that John Hancock's payment notices violated the Policies because the Policies contain no provision requiring the owners to repay the Loans nor giving John Hancock any right or claim against the owner for loan payments. DI 36 at 35. Second, that John Hancock raised the premiums to exorbitant amounts that they knew could not possibly be

paid. *Id.*

These two new theories under Count II do not work because John Hancock's conduct in both is expressly permitted by the Policies. As to the notices, it is true that the Policies do not create a direct claim against the owners for failures to pay back the Loans; however, they do entitle John Hancock to deduct outstanding debt associated with the insurance certificate from money it would otherwise pay under that certificate. *See* DI 19-3 at 4-5 ("The certificate is the only security for the loan . . . any amount payable by [John Hancock] is reduced by the certificate debt."). The Policies also specifically articulate that the term "certificate debt" includes amounts owed to John Hancock under the loan provisions, including interest. DI 19-3 at 3. Taking plaintiffs' allegations as true, the notices simply informed each plaintiff that failure to pay premiums and interest would result in the Policies lapsing.

As to the "exorbitant" premium amounts, plaintiffs' own exhibits establish that John Hancock did not unilaterally increase the contractual premiums in 2023. Indeed, the premium amounts demanded in John Hancock's March 2023 notices correspond to the annual premiums expressly set forth in the original policies. *See* DI 19 ¶ 61; DI 19-3 at 2, 43, 120. Notwithstanding that the 2023 premiums were identical to those expressly established in 1986, plaintiffs argue that John Hancock improperly increased the 2023 premiums from the 2020 amounts paid. DI 19 ¶¶ 43-45. However, plaintiffs derive these 2020 amounts from income reported for tax purposes, rather than the actual premium schedules set forth in the Policies. *See* DI 19-6. The implied covenant of good faith and fair dealing cannot override the express terms of the Policies. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). The figures plaintiffs cite do not plausibly establish that John Hancock demanded

anything more than was contracted.

Accordingly, plaintiffs cannot invoke the implied covenant on either of these alleged breaches. Sustaining them under Count II would eliminate John Hancock's express contractual right to terminate policies when outstanding certificate debt reaches the applicable loan value. It would also require John Hancock to accept substantially lower premium payments than what was contracted. Because the Policies' language expressly contradicts both of these claims, we can resolve this issue at the pleadings stage. *See Vorcheimer v. Philadelphia Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018). Count II is dismissed.[7]

**c. Count III Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL)**

Plaintiffs' last count alleges that John Hancock misrepresented that plaintiffs were required to pay the Loans (and interest) in full in order to maintain appropriate coverage, in violation of Pennsylvania's UTPCPL catchall provision, which prohibits any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." DI 19 ¶¶ 79-83; 73 P.S. § 201-2(4)(xxi). The test for deceptive conduct is whether the conduct has the tendency or capacity to deceive. *Gregg v. Ameriprise Financial, Inc.*, 664 Pa. 567, 586 (2021).

John Hancock argues that the UTPCPL claim is facially barred for two reasons. First, it

[7] Our holding is limited to the FAC and does not mean an insurer could never violate any contractual duties while administering loan payments. For instance, a claim could exist if plaintiffs alleged that John Hancock deliberately miscalculated the loan balances, charged unauthorized interest, misled plaintiffs as to amounts owed or consequences for nonpayment, or terminated coverage without complying with the Policies' notice provisions. *See Zhang v. CSL Behring LLC*, No. 23-2658, 2024 WL 493427, at *5 (E.D. Pa. Feb. 8, 2024) (citing *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996)). But the FAC does not plausibly allege any of those independent contractual violations. Plaintiffs' allegations instead depend on facts unsupported by the record — primarily that the loan payments had been waived. *See* DI 19 ¶¶ 72-78.

argues that UTPCPL claims govern only conduct before the formation of a contract relating to the sale of an insurance policy, not an insurer's post-formation conduct. DI 23-1 at 21-22. As plaintiffs note in their response, however, multiple decisions in this district, the Third Circuit, and Pennsylvania state courts have applied Pennsylvania's UTPCPL to the improper performance of contractual obligations. *See Oswald v. Pacific Life Insurance Company*, No. 25-2318, 2026 WL 1093352, at *12 (E.D. Pa. Apr. 22, 2026) (collecting cases). We agree and decline to restrict the UTPCPL to the pre-formation obligations of John Hancock.

Second, John Hancock argues that the UTPCPL claim is barred by the "gist of the action" doctrine. DI 23-1 at 23-24. That doctrine prohibits tort claims arising solely from contractual obligations, compared to those premised on an independent duty imposed by law. *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 110-11 (2014). John Hancock suggests that plaintiffs' UTPCPL claim violates the doctrine because it seeks to enforce the contractual obligations outlined in Count II. DI 23-1 at 24. However, plaintiffs' allegations in Count III implicate an independent duty to refrain from deceptive conduct. *See Dixon v. Nw. Mut.*, 146 A.3d 780, 790-91 (Pa. Super. Ct. 2016) (holding that the gist-of-the-action doctrine did not bar a UTPCPL claim based on an insurer's allegedly inaccurate premium billing statements); *Earl v. NVR, Inc.*, 990 F.3d 310, 315-16 (3d Cir. 2021). Plaintiffs allege that John Hancock affirmatively misrepresented its ability to collect on the Loans and the fact that plaintiffs were required to pay the loans, thereby misleading them into losing the benefit of the Policies. DI 19 ¶¶ 80-82. These misrepresentations are separate from the specific contract claims in Count II; the gist-of-the-action doctrine does not independently warrant dismissal of Count III.

We instead dismiss Count III because the allegations are entirely conclusory; the FAC

does not provide any facts to support plaintiffs' conclusions that John Hancock misrepresented its ability to collect on the policy loans or the fact that plaintiffs were required to pay the loans and interest. *See* DI 19 ¶ 81. Plaintiffs do not demonstrate that John Hancock misled them into believing anything beyond what the Policies state. Plaintiffs did not present facts suggesting that John Hancock told plaintiffs they were not liable for loan payments after the Ascena Bankruptcy. Nor are there facts demonstrating John Hancock withheld the availability of a separate payment arrangement, or misrepresented any amounts owed. Rather, John Hancock's notices expressly provided the amounts required for full accrued loan interest and also minimum payments necessary to maintain coverage. *See* DI 19-8.

It is true that John Hancock's compliance with the Policies would not necessarily insulate it from a claim premised on independently deceptive conduct. *See Oswald*, 2026 WL 1093352, at *12. The issue is that here, unlike in *Oswald*, the FAC alleges no such deceptive conduct. Instead, it appears that John Hancock was wholly separate from plaintiffs' ownership-transfer decision, only participating in the administrative forms after the decision at the request of Plaintiffs' then-counsel.[8] *See* DI 19-2 at 4-8. It is also true that John Hancock had a duty to

---

[8] During oral argument, counsel for John Hancock presented a request for judicial notice of prior legal malpractice litigation between plaintiffs and their then-counsel, in apparent support for the argument that the then-counsel, and not John Hancock, is to blame for plaintiffs' situation. *See* DI 32. Plaintiffs objected to the request as improper. DI 36 at 10, 22-23. While the 12(b)(6) phase is generally restricted to the four corners of the complaint, we may take judicial notice of another court's litigation for its existence. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). Our judicial notice of this malpractice litigation does not affect our decision to dismiss. Nonetheless, we do note that John Hancock's administrative forms included a rather telling "important notice" on the first page: "[i]f you have a question as to the legal effect of this form's provisions or tax or other implications of changing the designation, you should consult your own legal and tax professionals for advice." DI 19-2 at 4.

responsibly handle the administration of the ownership-transfer process. *See Dixon*, 146 A.3d at 789-90. But the FAC does not allege that John Hancock misled Plaintiffs through any part of that process. *See* DI 19 ¶ 81. Plaintiffs offer no supporting facts beyond their assertion that loan payments had already been waived in the Ascena Bankruptcy. *See id.* ¶ 82. Because we have decided, as a matter of law, that the loan payments were not waived, there is no misrepresentation alleged and therefore no viable UTPCPL claim.

## V. CONCLUSION

The FAC demonstrates that plaintiffs undertook substantial financial obligations of their own accord, after the bankruptcy proceedings of their employer, without appreciating their magnitude or how quickly the outstanding loans could jeopardize their coverage. Plaintiffs' decision carried the unfortunate consequence of acquiring coverage already burdened by substantial outstanding loans. But that was plaintiffs' decision, effectuated by plaintiffs' then-counsel. There are no plausible allegations in the FAC that John Hancock did anything improper. We therefore grant John Hancock's motion to dismiss. Although plaintiffs have already amended their complaint, we dismiss Count III without prejudice to afford them an opportunity to cure the identified pleading deficiencies concerning John Hancock's administration of the policy-ownership transfers, if the facts and law allow them to do so.